STEVEN G. KALAR
Federal Public Defender
Northern District of California
ELIZABETH M. FALK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:         Elizabeth_falk@fd.org

Counsel for Defendant TORRES

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 20-114 CRB |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM, OBJECTIONS TO THE PSR AND REQUEST FOR DOWNWARD VARIANCE** |
| v. | |
| JACKSON TORRES, | |
| Defendant. | |
| | **Court:**  The Honorable Charles R. Breyer |
| | **Hearing Date:**  November 18, 2020 |
| | **Hearing Time:**  1:00 p.m. |

# INTRODUCTION

The Court should impose a time-served sentence in this case, which is exactly 6 months as of the day of sentencing. Mr. Torres served 38 days in custody between February 5, 2020 and March 13, 2020; then will have served another 142 days between June 30, 2020 and November 18, 2020. That is a total of exactly 180 days, which is 6 months in custody. PSR at ¶ 3. At the conclusion of this federal case, he will return to San Francisco County to face additional prosecution for the June 30, 2020 offense detailed in the PSR. *See id*. at ¶ 25-28. He will then undoubtedly be deported from the United States. Given all these factors, combined with Mr. Torres' serious and sad drug addiction to fentanyl, 6 months in custody is a sufficient sanction for this low-level Tenderloin case. While the Guidelines in this case are completely miscalculated (*see* OBJECTIONS section, *infra*), it will not matter if this Court imposes a time served sentence. Such a sentence would be only a small departure from the *actual* applicable Guideline range of 12-18 months. (Offense Level 12, CHC II).

This case presents yet another Tenderloin street level drug case involving a poor Honduran immigrant. While it does involve very small quantities of the most serious of deadly drugs — fentanyl, it also involves a fentanyl addict. Sadly, Mr. Torres is deeply addicted to the drug and was clearly selling drugs in this case to support his own habit. Moreover, while Mr. Torres has broken the law and is remorseful for the harm he committed against society, this Court must put his crimes in perspective with other similarly situated defendants. The sentence requested by the government here – 21 months of incarceration – is far greater than comparative sentences doled out to similarly situated Tenderloin defendants. That, coupled with Mr. Torres' addiction and background, merit a significant Guideline variance by the Court in this case.

# STATEMENT OF FACTS

## I. MR. TORRES' BACKGROUND

Jackson Torres is 25 years old. He was born in Tegucigalpa, the crime-riddled capital of Honduras. After the sixth grade, Mr. Torres quit school in order to help support the family. At age 17, Mr. Torres realized that there was little to no future for him in Honduras. The gang situation had gotten out of hand. Numerous young men in his rural town were being threatened by gang members, who tried to convert people into robbing and stealing for the gang. In contrast, Mr. Torres has never

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*TORRES*, CR 20-114 CRB

1

even held a firearm. He does not believe in violence and could not imagine a life where he had to steal and threaten people in order to stay in good standing.

As he came of age, Mr. Torres heard about people who had taken their chances on America. He had heard of numerous 18 to 20 year olds from Honduras who had made the long journey and found plentiful work for incredible money. Per Mr. Torres, no one spoke of selling drugs the work mentioned was in restaurants, construction or farmwork for which an immigrant could pocket $2000 a month after expenses. $2000 a month sounded like a fortune to Mr. Torres.

It is little wonder then that at age 17, Mr. Torres, an unaccompanied minor, found himself alone, with no parents, atop a train slowly travelling from Honduras through Central America to Mexico and then eventually on foot to cross the border into the United States.



Image 1. Migrants arrive at a rest stop in Ixtepec, Mexico, after a 15-hour ride atop a freight train headed north toward the U.S. border on Aug. 4. Thousands of migrants ride atop the trains, known as *La Bestia,* or The Beast, during their long and perilous journey through Mexico to the U.S.[1]

Numerous authors back up Mr. Torres's description of his home country. Because of gangs, an ineffective government, drug trafficking, and poverty, Honduras currently claims the title of "murder

---

[1] *John Moore/Getty Images.* Taken from Sayre, Wilson, "Riding 'The Beast' Across Mexico To The U.S. Border" Parallels (June 4, 2014). Accessed at: https://www.npr.org/sections/parallels/2014/06/05/318905712/riding-the-beast-across-mexico-to-the-us-border.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*TORRES*, CR 20-114 CRB

2

capital of the world."[2] The government suffers from corruption and has lost international funding after allegations of human rights abuse.[3] There are also allegations of gang infiltration of their police force.[4] "According to the State Department, 42 percent of all cocaine headed to the U.S. and 90 percent of all cocaine flights now travel through Honduras."[5]  In sum, Honduras is tough place to grow up and an even tougher place to succeed in as a young, uneducated man.  Mr. Torres left his home country all alone, as an unaccompanied minor, for no other reason than to try to build a better life for all who are close to him.  It is somewhat unimaginable to think of this 17-year old boy navigating the train of death and the Mexican desert all in the name of economic prosperity.

## II.     MR. TORRES' HISTORY IN THE UNITED STATES

Mr. Torres's only journey to the United States ended in detention when the U.S. Border Patrol found him crossing the Arizona desert.  He was taken to an unaccompanied minors' detention facility in Phoenix and put into removal proceedings.  *See* Exhibit A, Notice to Appear.  A family friend, known to him as an "aunt" rescued him from the facility and took him to live with her in New Orleans, Louisiana.  PSR ¶ 48.  His immigration case was then moved to Louisiana.  Unfortunately, the aunt departed for El Salvador after several months, leaving Mr. Torres to fend for himself.  Friends eventually invited him to live in Oakland, California, where he has lived since 2014.

Mr. Torres diligently pursued his claim for asylum in the United States as a young adult.  He even sought the assistance of the San Francisco Public Defender's Office to help him file documents from San Francisco to the New Orleans court.  *See* Exhibit B, Letters and Proposed Orders from SF Public Defender's Office.  Unfortunately, the pro bono lawyer, Francisco Ugarte, had to withdraw unexpectedly because he developed a conflict of interest.  *Id.*  From thousands of miles away, without the ability to speak English and with no money to hire counsel, Mr. Torres could no longer pursue his

---

[2] United States Department of State Bureau of Diplomatic Security. Honduras 2018 Crimes and Safety Report, (April 3, 2018). Accessed at:
https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=23798

[3] Khan, Carrie, "Honduras Claims Unwanted Title of World's Murder Capital" Parallels (June 12, 2013). Accessed at: https://www.npr.org/sections/parallels/2013/06/13/190683502/honduras-claimsunwanted-title-of-worlds-murder-capital.

[4] *Id.*

[5] *Id.*

asylum claim. Nor was he sophisticated enough to figure out how to petition the Immigration Court to change the venue of his immigration case to San Francisco. Without representation or the wherewithal to defendant himself, Mr. Torres' asylum claim was abandoned.[6] Moreover, his Notice of Hearing never made it to him due to "service issues." *See* Exhibit D. Because he did not know about the hearing, and had not been able to hire counsel to address his asylum-related issues or fight deportation, he was ordered deported *in absentia* on November 29, 2017. *See* Exhibit E. This order of deportation is still operative and is the source of his current immigration detainer.

In addition to pursuing asylum, Mr. Torres has enjoyed a longstanding relationship with his girlfriend, Angeles Velazquez, with whom he shares a daughter, Josephine. PSR ¶ 48. Although undocumented, he has pursued work in construction helping to support his daughter, although his girlfriend has sole custody due to his addiction issues. He greatly enjoys spending time with his girlfriend and his daughter, however, and cares deeply for both of them.

## ARGUMENT

### I. OBJECTIONS TO THE SENTENCING GUIDELINES

#### A. THE USE OF GROSS WEIGHTS RENDERS THE PSR'S OFFENSE LEVEL COMPLETELY ERRONEOUS

"[T]he government should bear the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level" as well as "when it seeks to raise the offense level." *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990). *See also* U.S.S.G. § 6A1.3 (preponderance of the evidence standard applies). Here, the PSR erroneously calculates the Base Offense Level as 16 in this case, referencing the **gross weights** of the drugs Mr. Torres had as 38.85 KG of converted drug weight. *See* PSR at § 14. This fact is significant because one of the drugs at issue is fentanyl – which is sold in miniscule quantities packaged in large wrapped-up plastic bindles, which is then further wrapped up in a plastic bag. *See* Exhibit F (photograph of drugs,

---

[6] Mr. Torres' counsel attempted to obtain the asylum claim details from Mr. Torres' A-file. *See* Exhibit C – ICE Notice of Refusal to Disclose Asylum Claim. The government willingly provided the A-File, but due to ICE regulations, the details of the asylum claim are prohibited from disclosure. *See id*. Accordingly, counsel was unable to provide the Court with the full record or any details related to Mr. Torres' asylum claim.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*TORRES*, CR 20-114 CRB

4

including packaging). When it comes to street-level fentanyl sales, the packing material is the gross majority of the weight. Accordingly, the PSR Guideline calculations are wrong and the Court should adjust the Guidelines in the manner that Mr. Torres concedes, outlined below.

"Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used." *See* U.S.S.G § 2D1.1, Commentary, n. 1. Packing material is thus purposely excluded from converted drug weight calculation. Here, however, the converted drug weight of 38.85 KG is almost *exclusively* packaging material. The photographs of the drug readily prove this fact. *See* Exhibit F. Moreover, the quantities at issue in Mr. Torres' June 30, 2020 Tenderloin arrest – not charged by the federal government — readily reveal the problem with the PSR's Offense level calculation. *See* PSR at ¶ 28. This arrest is indicative, because unlike the instant case, in the June case the Alameda County Sheriff's Department tested for the *actual net weight of the drugs* Mr. Torres possessed in the Tenderloin on June 30, 2020. *Id*. Given Mr. Torres' pattern and practice, it makes sense that the fentanyl and methamphetamine he was caught with on June 30, 2020 was packaged similarly, and contained similar doses, as the fentanyl and methamphetamine at issue in this case.

The following is a comparison of the gross and net weights from that arrest (*see* ¶ 28):

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

June 30, 2020 Arrest:

| DRUG | GROSS WEIGHT | NO. OF BINDLES. | NET WEIGHT | CONV. KG |
|---|---|---|---|---|
| Fentanyl | 10.2 gm. total | 21 | **.7 gm.** | 2 |
| Meth. | 2.1 gm. | 1 | .43 gm. | 1 |
| Heroin | 6.7 gm. | 4 | 1.46 gm. | 1.5 |

As the Court can see, packaging takes up most of the weight for the drugs Mr. Torres is now charged in state court for distributing in the Tenderloin, a mere 4 months after his arrest in this case. Turning to the instant case, the following drugs quantities and bindles apply (see PSR at ¶ 8):

| DRUG | GROSS WEIGHT | NO. BINDLES. | NET WEIGHT |
|---|---|---|---|
| Fentanyl | 10.1 gm. total | 13 | ????? |
| Meth. | 6.8 gm. | 1 | ??????? |

Because the government did not test for the net weights in the instant case, Mr. Torres submits that the Court should reach the following conclusion about the applicable Offense Level in this case, using the net weights established by the June 30, 2020 as a guide:

| DRUG | GROSS WEIGHT | NO. BINDLES. | NET WEIGHT | CONV. KG. |
|---|---|---|---|---|
| Fentanyl | 10.1 gm. | 13 | 1.4[7] | 3.75 |
| Meth. | 6.8 gm. | 1 | 4.8 | 9.6 |

**TOTAL CONVERTED DRUG WEIGHT:** **13.35 KG**

BASE OFFENSE LEVEL: 14

LESS ACCEPTANCE: -2

TOTAL ADJUSTED OFFENSE LEVEL: 12

---

[7] This calculation assumes that there was nearly twice as much fentanyl at issue in the February 5, 2020 arrest as there was in the June 30, 2020 arrest. On June 30, 2020, Mr. Torres was arrested with 21 bindles of fentanyl with a gross weight of 10.2 grams. Because the net weight of the fentanyl turned out to be .7 gm, each of the 21 bindles had .0333 grams of fentanyl. Of the 10.2 grams gross, 9.5 grams of the weight was packaging. On February 5, 2020, Mr. Torres was arrested with 13 bindles of fentanyl (approximately half the quantity of bindles as he was arrested with on June 30, 2020) that in total had nearly the same gross weight of 10.1 grams. Because he had approximately half the quantity of bindles but almost the same gross weight of fentanyl, Mr. Torres will assume for the sake of resolution that each bindle from February 5, 2020 had approximately double the quantity of fentanyl per bindle as did the June 30, 2020 arrest.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*TORRES*, CR 20-114 CRB

6

Given the totality of the circumstances, Mr. Torres submits that this is a reasonable calculation of the net weights involved in the February 5, 2020 arrest, based on a preponderance of the evidence. The Court should adopt Mr. Torres' conceded Guideline calculation.

**B.     THE CRIMINAL HISTORY CATEGORY SHOULD BE II.**

Paragraph 32 of the PSR contains a conviction that is utterly unsupported by the record. *See id.* (reflecting a conviction on December 10, 2014.) All the documentary evidence provided to Mr. Torres in this case, including the draft Presentence Report, the rap sheet, the Prebail report, and the government discovery make no mention of this conviction. When the undersigned requested documentary support for the conviction, the Probation Officer indicated he had none.

Due process requires that a defendant be sentenced on the basis of accurate information. *See Roberts v. United States, 445 U.S. 552, 556, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980)*. Thus, a district court may consider any relevant information, "provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see also United States v. Sustaita,* 1 F.3d 950, 952 (9th Cir. 1993). When a defendant contests a presentence report's description of an alleged prior conviction, the government must show that the description in the report is based on a sufficiently reliable source, and where the presentence report cites solely nonjudicial records, the court must conduct additional inquiry into the reliability of these sources. *See United States v. Ponzo*, 853 F.3d 558 (1st Cir. 2017); *see also United States v. Showalter*, 569 F.3d 1150, 1160-1161 (9th Cir. 2009)(probation officer's phone call to bankruptcy trustee insufficient to prove the "over 50 victim" enhancement); *see also United States v. Floyd*, 343 F.3d 363, 373 (5th Cir.2003)(district court's criminal history finding was overturned because "[t]he only evidence ... from which the district court could have concluded that [the defendant] had a prior conviction was the unsworn statements of the probation officer," and no "supporting documentation evidencing [the] conviction[ ] was ever provided."

Here, every aspect of the alleged conviction, including the statute number, the alleged plea, the alleged sentence, and the dates are all being conveyed orally to the Court, with no means by which the Court can review the accuracy of the information. The Court should strike paragraph 32 from the PSR and find that Mr. Torres lies in Criminal History Category II.

## II.   REQUESTED DEPARTURES/VARIANCES

From the applicable Guideline range of Adjusted Offense Level 12, CHC II, and a range of 12-18 months, the Court should vary downward to the time served (exactly 6 months) for a number of reasons. First, the Court should vary or depart upon a review of comparative Tenderloin cases and their respective sentences. Specifically, the Court should vary downward because the comparative review indicates that judges in this District largely impose the type of sentence Mr. Torres requests here – time served (or the equivalent of between 3 and 6 months). Second, the Court should vary because even though fentanyl is a very dangerous drug, Mr. Torres himself is addicted to it and was selling small quantities to support his addictive habit. Third, the Court should vary due to Mr. Torres' poor and disadvantaged background, having come to the U.S. alone as an unaccompanied minor in pursuit of an asylum claim. All these reasons justify the Court varying from a within-Guideline sentence of 12 months and one day (approximately 10 months of actual custody time) to time served (6 months of actual custody time.)

### A.   COMPARATIVE SENTENCES DEPARTURE GROUND – 18 U.S.C. § 3553(a)(6).

a. *United States v. Jesus Flores*, CR 19-429 SI. Mr. Flores was arrested for a $15 drug sale. Officers found $932 cash and other drugs on him, including 56 grams of cocaine base, 38.2 grams of heroin, 32.5 grams of methamphetamine, and 31.1. grams of marijuana (gross weights). He had been deported twice in the past. Mr. Flores' Guidelines range was 10–16 months. Judge Illston sentenced him to time served (effectively four months).

b. *United States v. Wilfredo Cabrerra*, CR 19-452 WHO. Mr. Cabrerra was convicted of a $17 heroin sale. His Guidelines range was 8–14 months. Mr. Cabrerra's record was far more serious than Mr. Torres', as it included three prior convictions for drug sales—including one that resulted in a four-year prison sentence—and six deportations. Judge Orrick sentenced him to time served (effectively four months).

c. *United States v. Brayan Arteaga*, CR 19-426 WHO. Mr. Arteaga was convicted of a $16 crack cocaine sale. He was on probation at the time of the offense, and faced a

Guidelines range of 8–14 months with an offense level of 10 and a Criminal History Category of II. Judge Orrick sentenced him to time served (effectively one month).

d. *United States v. Jose Ramos-Varela*, CR 19-713 EMC. Mr. Ramos-Varela was arrested for a $20 methamphetamine sale, and additional heroin was recovered from his person when he was arrested. He had one prior deportation that occurred subsequent to a prior felony drug conviction. His Guidelines range was 10–16 months. Judge Chen sentenced him to time served (effectively two months).

e. *United States v. Galeas-Raudales*, CR-19-660 EMC; This defendant had been arrested selling drugs at least 5 times in the Tenderloin over an 18 month span and faced a sentencing Guideline range of 24-30 months at CHC III for selling crack cocaine in the Tenderloin. Gov. Memo, Dkt. 14 at 1. Moreover, the defendant had previously been sentenced to a 364 day term of custody on one of his prior drug convictions, which had not deterred him. *Id*. at 4. The government asked for a 24 month sentence, the low end of the range. *Id*. Judge Chen instead elected to give a time served sentence, which approximated 3.5 months. *See* Judgment, Dkt. 23.

f. *United States v. Arnulfo Estrada,* CR-19-546 CRB*;* This defendant had a prior conviction for illegal entry to the United States, and had been arrested with drugs twice by SFPD at the time of his federal prosecution – once on October 2, 2019 (the subject of the federal charges) then again on October 16, 2019 with more drugs (not prosecuted federally). At his federal arrest, Mr. Estrada had 95 bindles of cocaine, 21 bindles of meth, and 18 bindles of heroin. The government proceeded with converted weight Guidelines and requested an 18-month sentence. *Id*. This Court instead gave a time served sentence of approximately 3 months. *See* Def. Memo, Dkt. 14 at 9; Judgment, Dkt. 20.

g. *United States v. Aaron Servellon,* 19-689 RS: In this similarly situated Tenderloin case, the government agreed to an adjusted offense level of 13 and recommended a sentence of 6 months – despite the fact that the police report of Mr. Servellon's arrest resulted in a seizure of 38.7 gms gross of methamphetamine, 28.8 grams gross

of fentanyl, 42.3 grams gross of heroin, and 32.2 grams gross of crack cocaine. Judge Seeborg ended up giving a time served sentence of approximately 3.3 months.

h. *United States v. Trejo,* CR-19-535 RS:  In this case, the defendant pleaded guilty to a cornucopia of drugs sold (with relevant conduct) on 4 different dates in the Tenderloin over a 15 month period.  Gov. Memo, Dkt. 21 at 1.  The resulting Guideline range was still high at 21-27 months' imprisonment.  *See* Gov. Sent. Memo, Dkt. 21 at 4.  This Court instead gave a time-served sentence – approximately 5 months of federal time (6.5 months counting state custody time on the same offense.)

i. *United States v. Martinez-Elvir*, CR-19-545 SI, the defendant had 4 different drugs including the two Mr. Torres is accused of possessing for sale in this case.  The methamphetamine was tested and found to be 99% pure.  At 4.84 grams, the methamphetamine overwhelmingly drove the Adjusted Offense Level of 21, resulting in a Guideline range of 37-46 months at CHC I.  *See* PSR at Dkt. 18.  The government in that case requested a 37 month sentence.  Gov. Memo, Dkt. 20 at 1. Judge Illston instead inposed a time-served sentence, which was approximately 4 months.  *See* Judgment, Dkt. 26; *see also* Def. Sent. Memo, Dkt 22, at 5.

j. *United States v. Betanco,* CR-19-645 RS; 20-217 RS.  While on state court probation, Erik Betanco was similarly charged federally for selling drugs in the Tenderloin.  Unlike Mr. Torres, however, **Mr. Betanco had large quantities of fentanyl across two separate federal cases, sentenced together**.  In his first case, Betanco was arrested with 9.5 grams gross of cocaine (1 bag), 13.2 grams gross crack cocaine (25 bindles), 39.6 grams gross of heroin (86 bindles) and **32.1 grams gross of fentanyl (86 bindles)**.  *See* Gov. Memo, Dkt 31 at 3.  The case was charged federally unbeknownst to Betanco, who had failed to appear for the state case.  Two and a half months later, officers found Betanco with drugs for sale in the Tenderloin again when they arrested him on the first federal indictment.  The government superseded, adding subsequent charges for the following quantities:

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*TORRES*, CR 20-114 CRB

10

Fentanyl (45 bags) **26.5 grams net weight** • fentanyl (1 bag) **27.9 grams net weight**, • cocaine, 3.393 grams, methamphetamine (nine bags): 8.8 grams net weight,  heroin (74 bags): 33.6 grams net weight.  *See id.* at 4.  For both cases together, which involved **well over 50 grams net of fentanyl** and two 5-year mandatory minimum charges (for methamphetamine and fentanyl), Judge Seeborg gave Mr. Betanco 14 months in custody.  **This was for 320 combined kilograms of converted drug weight.**  Here, there is less than 20 kilograms of combined weight, even considering the February 5, 2020 and the June 30, 2020 offenses together.  When compared to Mr. Betanco's 14 month sentence and relative drug quantity, the 21-month recommendation of Probation is nothing short of over the top.  Instead, a 6 months custodial, time-served term is the proportional, just and fair result.

### B.       OTHER GROUNDS FOR DEPARTURE/VARIANCE

Should the Court need additional grounds for a departure or variance to time served, this case presents numerous bases upon which to do so.

The Court is familiar with the directives of *United States v. Booker,* 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a).  The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence.  Importantly, the Court may not presume the Guidelines range is reasonable.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).  Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6).  In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

*First,* the court should consider Mr. Torres' background and history, including the fact that he arrived in this country as an undocumented, unaccompanied minor. *See* Exhibit A. He did not come here to sell drugs, but in search of a better life. He sought asylum and even secured pro bono counsel to file that petition for him; through no fault of his own, it was abandoned due to his illiteracy and inability to secure conflict-free pro bono counsel in New Orleans, which was thousands of miles from his girlfriend. The Court should take note that Mr. Torres tried to legitimize his status and has significant fear of returning to his home country. And although he ultimately fell pray to the cartel like almost all of the federal Honduran Tenderloin defendants this Court sees, he suffers from a significant drug addiction that was the driving force of his criminal conduct.

*Second*, the charged offense and Mr. Torres's current circumstances counsel in favor of a time served sentence of six months. This case should never have been prosecuted federally. The offense was a very small street-level drug sale that did not involve violence, weapons, possession of large quantities of controlled substances, or other aggravating factors. Mr. Torres has minimal prior criminal history. He is not a serious offender or a threat to our community. Rather, he is a refugee from extreme poverty and gang violence in Honduras who sought economic opportunities in the United States and was ultimately taken advantage of by a larger drug trafficking organization. Federal prosecutions such as this one inappropriately single out impoverished immigrants in our community where the gravity of the crime simply does not warrant the use of federal resources, let alone a multi-month sentence. Given the circumstances of the offense, additional custodial time is certainly not necessary to mete out sufficient punishment, consistent with the mandate of § 3553(a).

*Third*, deterrence does not justify a longer sentence. As an initial matter, the available data does not support the conclusion that longer sentences promote general deterrence.[8] Given the particular the circumstances of this case, the concept of specific deterrence does not make much sense either. More fundamentally, Mr. Torres, like many immigrants, faces far worse conditions in Honduras. The violence and hardships at home drove him to take the extraordinary and unwelcome

---

[8] *See, e.g.,* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?* FEDERAL PROBATION 80 (3), 33-38 (Dec. 2016) ("Severity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely an individual is to commit a crime. However, this assumption has not been supported in the literature.").

steps of fleeing his family and his country, and ultimately to commit the instant crime. Mr. Torres took these steps in order to survive. The deterrent value of a marginally longer sentence, weighed against the desperation felt by immigrants such as Mr. Torres, is doubtful at best. The ordeal of his incarceration and near-certain deportation thereafter is more than sufficient to deter him from reoffending or returning to this country.

*Fourth*, public safety certainly does not mandate a longer sentence. Mr. Torres is not violent, he is not a leader or organizer, and he does not belong to a gang. Quite to the contrary, he is the lowest man on the totem pole and the least culpable person involved in the entire operation. Although the government has attempted in many of these cases to justify its misguided campaign of low-level drug prosecutions in the Tenderloin by citing statistics concerning substance abuse and deaths in the area, there is no evidence that prosecuting the lowest level offenders will have any impact on public health and safety.

*Fifth*, Mr. Torres personal history strongly counsels in favor of a downward variance. Although this Court sees many defendants from disadvantaged backgrounds, Mr. Torres has faced truly extreme challenges during his life. Despite his own poverty and lack of education, he has tried to support his girlfriend and his daughter. Thus, while the instant offense is reprehensible, it is also understandable why Mr. Torres committed the crime after arriving to this country with a misguided, starry-eyed view of what life in America would be like. While he arrived with lofty goals and aspirations, reality and debt soon set in. This is the reason Mr. Torres returned to selling drugs, even while on Pretrial release. Although his actions justify punishment, he has received that punishment through 6 months, time served in custody. Mr. Torres's personal circumstances do not favor imposition of a longer sentence.

*Sixth,* it is almost certain that Mr. Torres will be deported following resolution of the instant matter and the state case related to the June 30, 2020 arrest. Because of the nature of the charge, this conviction will trigger draconian immigration penalties beyond deportation. Almost every avenue for relief that he otherwise would be able to pursue as a potential defense in immigration proceedings will no longer be available to him. Most severely, Mr. Torres will be rendered permanently inadmissible to the United States, meaning that he will be barred from re-entry for the rest of his life.

Finally, before his deportation, he will spend an uncertain period of time in immigration detention—a time period that could easily stretch to a month or more—which will serve as an additional custodial consequence of his conduct.[9] Ultimately, however, the greatest punishment here is a certain and indefinite return to Honduras.

As set forth above, Mr. Torres came to the United States from Honduras because there was no realistic opportunity of gainful employment there and because he was a target of gang-related violence that pervades the country. Although this fact does not excuse Mr. Torres's criminal conduct, it does provide an important perspective, especially when considering the role in creating those violent conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL [hereinafter 2018 Crime & Safety Report][10]; *see also* Gangs in Honduras, INSIGHT CRIME [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war.").[11] Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world. Central America Refugee Crisis, U.N. REFUGEE AGENCY[12]; *see also* Gangs in Honduras at 1. Violence in Honduras includes "homicide, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2018, Honduras, U.S. DEPT. OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR at 1.[13]

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries

---

[9] An ICE detainer has already been lodged against Mr. Torres due to his *in absentia* deportation order. PSR at 1.
[10] Available at https://www.osac.gov/Content/Report/84d448fd-c42b-462c-91ce-15f4ae5df483.
[11] Available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf.
[12] Available at https://www.unrefugees.org/emergencies/central-america/.
[13] Available at https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/.

unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS [hereinafter Crime and Violence] at 1–2.[14] In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the most recent Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017).[15] Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country and demonstrate why many people such as Mr. Betenco are fleeing in hopes of creating safer and more sustainable lives. This offense must be placed in the context of this larger picture.

    *Seventh*, and finally, the Coronavirus pandemic counsels in favor of a time served sentence. As the Court is no doubt aware, conditions at Santa Rita Jail are dangerously conducive to spreading the virus. Numerous units within the jail have already been exposed and Mr. Torres is terrified that if he is infected while serving more time, even a marginally longer sentence than time served could be dangerous. This sentence has already had a dramatic deterrent effect on Mr. Torres individually, as he is realizing the full weight of incarceration during a pandemic where the advisable social distancing and cleaning provisions are impossible to maintain. He spends every day in custody far more afraid than would be typical of a stint at Santa Rita jail in normal times.

---

[14] Available at https://www.wilsoncenter.org/sites/default/files/media/documents/publication/FINAL%20PDF_CARSI%20REPORT.pdf.
[15] Available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression.

## CONCLUSION

For all the reasons set forth above, Mr. Torres respectfully asks that the Court sentence him to time-served, which is exactly 6 months in custody on the day of sentencing, followed by three years of supervised release.

Dated:     November 13, 2020          Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

              /S
ELIZABETH FALK
Assistant Federal Public Defender